**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**LINWOOD LAMONT JONES,**

**Plaintiff,**

**v.**                                                    **Civil Action No. 1:16cv212**
                                                         **(Judge Kleeh)**

**MR. M. WEAVER; DR. E.
ANDERSON; and PA C. GHERKE,**

**REPORT AND RECOMMENDATION**

**Procedural History**

Plaintiff initiated this action on November 16, 2016, by filing a complaint

pursuant to <u>Bivens v. Six Unknown Named Agents of the Bureau of Narcotics</u>, 403 U.S.

388 (1971), a case in which the Supreme Court created a counterpart to 42 U.S.C. §

1983 and authorized suits against federal employees in their individual capacities.  ECF

No. 1. Because Plaintiff did not file a Motion for Leave to Proceed *in forma pauperis,* or

pay the $400 filing fee, the Clerk of Court sent him a Notice of Deficient Pleading. ECF

No. 3. On December 12, 2016, Plaintiff paid the $400 filing fee. ECF No. 5.

On January 30, 2017, Magistrate Judge Michael Aloi conducted a preliminary

review of the complaint and determined that summary dismissal was not appropriate.

However, because Plaintiff had paid the filing fee and was not proceeding *in forma*

*pauperis*, he was responsible for obtaining service of process on his own, and

accordingly, Plaintiff was made aware of the requirements of Rule 4(m) of the Federal

Rules of Civil Procedure. Summonses were issued and sent to Plaintiff for service. ECF

No. 7.

Following a protracted effort by the Plaintiff to secure service[1], Tara Tighe,
Assistant United States Attorney, appeared specially and for the limited and exclusive
purpose of filing a Motion to Dismiss pursuant to Rule 12(b)(5) of the Federal Rules of
Civil Procedure for failure to serve the Defendants. On  December 27, 2017, United
States Magistrate Judge James Seibert entered a Report and Recommendation in
which he recommended that the Motion to Dismiss be granted in part and denied in
part. More specifically, he recommended that the motion be granted with respect to J.
Fikes. Dr. T. Savage and Warden R.A. Purdue, and the Plaintiff's complaint be
dismissed without prejudice as to those Defendants. He further recommended that the
motion be denied with respect to Dr. E. Anderson, P.A. Gherke and Mr. M. Weaver.  No
objections were filed, and on March 2, 2018, the Report and Recommendation was
adopted. ECF No. 34. Accordingly, Defendants Fikes, Savage and Perdue were
terminated as Defendants.

On May 7, 2018, the remaining Defendants, Anderson, Gherke and Weaver filed
a Motion to Dismiss or, alternatively, for Summary Judgment. ECF No. 42. On May 8,
2018, a Roseboro Notice was issued [ECF No. 45], and on May 29, 2018, the Plaintiff
filed a combined Response to the Defendants Motions and Motion for Discovery to
oppose the Motion for Summary Judgment. ECF No. 50. On June 12, 2018, the
Defendants filed a Response in Opposition to the Plaintiff's Motion for Discovery. ECF
No. 50.  This case is now before the undersigned United States Magistrate Judge for a
Report and Recommendation

.

[1]The Amended Report and Recommendation filed on December 2, 2017 [ECF No. 31] sets forth
the details surrounding the Plaintiff's efforts to obtain service on the six Defendants named in
his complaint.

## Factual History

The Plaintiff was convicted in the United States District Court for the Western District of Virginia following entry of a guilty plea. Judgment was entered on August 7, 2009.[2]  He arrived at FCI Gilmer on August 28, 2009, where he remained incarcerated until May 5, 2015, when he was transferred to the Federal Medical Center in Lexington, Kentucky. ECF No. 43-1 at 12-13.  He was released from custody on October 15, 2018.[3]

The nearly 800 pages of medical records[4] provided by the Defendants begin July 2, 2012, when the Plaintiff was seen by Defendant Gherke, a physician's assistant, in the Pulmonary/Respiratory clinic with a chief complaint of a pulmonary infection. However, he noted that in 2010, he was working in UNICOR and bent over to pick up a piece of steel and pulled his back muscles. He stated that he had never been given anything for the pain he has from that event even though an x-ray showed changes in his lumber spine. ECF No. 43-1 at 48. It appears that the Plaintiff was added to the Orthopedic/Rheumatology clinic with a differential diagnosis of degeneration of thoracic or  thoracolumbar intervertebral disc. Id. at 46.

On March 1, 2012, he presented to the clinic to request a renewal of his bottom bunk pass. He stated that it was difficult to go up and down the ladder, and he was told he would not be able to stay on his bottom bunk unless he got the pass renewed. The record is not clear as to whether that pass was renewed. ECF No. 43-1 at 44-45.

---

[2] See Criminal Docket for Case No.7:09-cr-00048-GEC-4 available on PACER.

[3] See bop.gov/inmateloc/

[4] In summarizing these records, the undersigned has confined himself to records dealing with the Plaintiff complaints about, and treatment for, weakness in his lower extremities, numbness, difficulty walking, and muscular-skeletal pain.

On July 19, 2012, the Plaintiff was seen by Defendant Gherke with a complaint of pain in his hands and back with tingling and numbness in his hands. He stated that these symptoms started on the 3rd of July after he was cuffed. He was prescribed ibuprofen and was offered Elavil and Neurotin (nerve pain medication), but declined that medication stating that he would like to think about it. ECF No. 43-1 at 34-35.

On July 26, 2012, the Plaintiff was seen by Defendant Anderson, an osteopath. The Plaintiff indicated that he was doing okay with his respiratory issues but had numbness of the right fourth and fifth finger that extended up to his elbow, pain at the inferior scapula, numbness of the right side, and unsteadiness which required him to plant his right foot to make any turns or to corner. He also indicated that "years ago" he had a herniated disc and his current symptoms felt like those he had then. However, he indicated that  x-rays would not show the herniation. ECF No. 43-1 at 30. Physical examination revealed that the Plaintiff's shoulder, wrist, hand, fingers and thoracic and lumbar spine were without abnormal findings. There was neither limitation in motion nor any movement that caused pain. Defendant Anderson prescribed  ibuprofen and ordered x-rays. Id. at 31-32.

On October 31, 2012, Defendant Gherke ordered an x-ray of the Plaintiff's left scapula based on his report of pain. The results of the x-rays taken on that date were: scapula was negative; AP T-Spine was negative except for mild degenerative disc disease; Lat L-S was negative except for mild degenerative disc disease; L4-L5/S1 was negative except for mild degenerative disc disease.[5] ECF No. 43-1 at 2.

---

[5] It is unclear whether the x-rays ordered by Defendant Anderson on July 26, 2012, and the x-ray ordered by Defendant Gherke on October 31, 2012, were completed on the same date. In addition, the undersigned was unable to locate the report summarizing the radiologist's findings.

On December 6, 2012, the Plaintiff was examined by Defendant Gherke for routine chronic care. He had a normal gait and indicated that he felt well other than he thought he had a sinus infection. ECF No. 43-1 at 18-19.

On March 7, 2013, a different physician's assistance saw the Plaintiff in the chronic care clinic regarding his concerns over worsening history of back/neck symptoms making it difficult for him to walk. The Plaintiff reported that his left foot was dragging for a few steps before he got going and then it was better. He also reported that his whole right side was numb from his shoulders to his feet and this seemed to be getting more painful as well. The physician's assistant ordered  an x-ray of the cervical spine[6] and requested a neurology consult for electromyogram. ECF No. 43-1 at 151-54.

On June 20, 2013, Defendant Anderson made an administrative note after he reviewed the Plaintiff's work with his work supervisor in relation to considering a neurology consult. His supervisor advised that there was no limitations or deficit at the time, and therefore, Dr. Anderson deferred the neurology consultation and instead submitted a request for an MRI of the brain, cervical spine and lumbar spine. ECF No. 43-1 at 145.

On June 27, 2013, Defendant Anderson examined the Plaintiff and noted that he complained of multiple muscular skeletal issues since 2010 but denied any specific injury. He specifically complained of no feeling in his right leg/hip/up his side, tingling of the right hand, left leg dragging, and he thought the muscles in his left hamstring had gotten smaller. Physical examination did show some weakness in the Plaintiff's motor

---

[6] Again, the undersigned has been unable to locate the radiology report of any x-rays taken per this order. However, Defendant Anderson, in his Declaration, notes that x-ray of the Plaintiff's cervical spine was taken on April 12, 2013, and showed only mild degenerative disc disease. ECF No. 43-1 at 3, ¶ 13.

strength and a favoring gait. Defendant Anderson noted: "Appreciable observations –
appeared to be variably dragging toe, not consistent with such of a peroneal nerve
injury of spinal injury, more of dorsiflexion and not consistently with every step, had one
slight unsteadiness when transitioning up from seating position and one during stepping
onto scale but was otherwise able to transition to seat without balance or strength
issues (Lumbar/Hamstring strength), arms/hands with no notable issues." ECF No. 43-1
at 142. Defendant Anderson continued the Plaintiff's prescription for ibuprofen 800MG
for back pain and requested labs. Id. at 143.  Finally, Defendant Anderson noted that
"exam continues to be less impressive than complaints. Again, today I'm not inclined to
see how all of this could be connected and history certainly doesn't support
observation/exam findings. Initiate further work up, duty/activity restrict to avoid injury,
pending MRI through URC[7]." Id. at 144.

On June 28, 2013, the Plaintiff was paged to medical and an attempt  was made
to issue him a cane. Despite being forewarned that his condition could worsen if he
refused the cane, he would not take the cane and  refused to sign the Medical
Treatment Refusal Slip. ECF No. 43-1 at 138, 226.

On October 9, 2013, the Plaintiff was examined by a physician's assistant for
issues with his left leg that the Plaintiff reported were getting worse. The Plaintiff
indicated that he had noticed increased fatigue with his left thigh muscles and he had
been working hard to keep the leg and knee strong, but it was getting worse. The
Plaintiff reported feeling a pronounced drag and delay of movement and strength. He
further indicated that it felt like something moving behind his knee and that the pain

---

[7] UTC stands for Utilization Review Committee which meets to discuss possible inmate referrals
to outside facilities and/or providers for treatment and determines whether to approve or deny
the referral. ECF No. 43-1 at 3, ¶ 17.

radiated from his low back to the front left groin and then down the inner thigh. The plaintiff reported no pain on effort, but indicated that he could not lift, pullback, or straighten his left knee. ECF No. 43-1 at 128. Physical examination noted the left leg muscle weakness with normal reflexes. X-rays were ordered for the left knee and lumbar spine and a neurology evaluation was requested for nerve palsy of an unknown etiology.  Id. at 130.

Again, the radiology report does not appear to be in the record. However, Defendant Anderson indicates that x-rays were taken on November 8, 2013. The lumbar spine was negative except for mild degenerative disc disease. The knee x-ray was abnormal noting an enthesophytes lucency across the patella that could be a fracture. ECF No. 43-1 at 4.

On November 12, 2013, the Plaintiff was examined by Defendant Gherke for his neurology complaint. He reported continuing leg problems and reported the same symptoms as before. Defendant Gherke noted that the Plaintiff had a very difficult time lifting his leg the two inches of the ground to stand on a scale and it took him multiple tries. He denied any acute injury. His x-rays were reviewed and Defendant Gherke noted that the x-ray indicated a possible acute fracture of the knee. Defendant Gherke spoke to the other mid-level provider who had ordered the x-ray who indicated it was ordered as a precaution based upon the history of reporting knee pain. Defendant Gherke noted that the Plaintiff had an MRI scheduled for December 5, 2013. ECF No. 43-1 at 120. The x-ray of the knee was reordered, and the Plaintiff was prescribed Gabapentin for his nerve pain and ibuprofen was continued. In addition, an orthopedic consult request was submitted for evaluation and a treatment plan. Defendant Gherke

7

noted a provisional diagnosis of questionable fracture of the inferior patellar ethesophytes.  Id. at 123. Defendant Anderson entered an administrative note that same date, indicating that the clinical encounter associated with the x-ray did not appear to indicate any fracture, but the Plaintiff would be referred for follow-up to clarify. Id. at 125.

According to Defendant Anderson's Declaration, an MRI of the brain was taken on December 5, 2013 and was normal. An MRI taken of the lumbar spine showed varying degrees of mild-to-moderate stenosis and foraminal narrowing. The MRI of the cervical spine showed varying degrees of spinal stenosis and an area of hyperintensity at the C6-7 spinal cord. ECF No. 43-1 at 5, ¶ 24. On December 10, 2013, Defendant Anderson made an administrative note after reviewing the MRI and scheduled the Plaintiff for a follow-up to correlate and to request a neurology or neurosurgery consultation if needed. ECF No. 43-1 at 117.

On December 17, 2013, Defendant Gherke had a follow-up with the Plaintiff. He indicated that the Gabapentin was helping with pain. Defendant Gherke documented the improving pain, increased the Gabapentin dose and requested a neurosurgery consultation. ECF No. 43-1 at 113-14. On January 3, 2014, the Plaintiff was approved for the neurology consultation.

On January 9, 2014, the plaintiff had a consultation with an orthopedic specialist for his left leg pain. Again, the report does not appear to be contained in the medical records. However, Defendant Anderson, indicates in his Declaration that the orthopedic specialist found his medical inspection to be unremarkable. The Plaintiff's range of motion was noted as normal with full flexion and full extension. He did exhibit weak

quadricep strength. There was normal perfusion distally, as well as normal touch sensation distally. All ligaments were noted to be stable. According to Defendant Anderson, the specialist recommended an MRI of the left knee ECF No. 43-1 at p 5, ¶27.

On May 2, 2014, Dr. Savidge evaluated the Plaintiff on his routine chronic care visit. The Plaintiff reported worsening back and knee pain and radiculopathy. He requested resumption of Neurontin (Gabapentin) at a higher dose. Dr. Savidge noted that a neurosurgery consultation and a knee MRI was pending. The Plaintiff's exam showed a normal gait, and he was continued on his Gabapentin at 600 mg. two times per day for 180 days.  In addition, acetaminophen and ibuprofen were also renewed. ECF No. 43-1 at 297-300.

According to Defendant Anderson's Declaration, on June 17, 2014, the MRI of the knee was done and revealed no evidence for acute osseous, meniscal or ligamentous injury of the knee. There was vocal fluid underlying the Pes Anserine tendons just proximal to their tibial insertion, suspicious for Pes Anserine bursitis. There was also a mild chronic patellar tendinopathy, with small amount of edema in the deep infrapatellar bursa. ECF No. 43-1 at 5, ¶32.

On July 10, 2014, the plaintiff was seen by an RN for muscle spasm and low back pain. The nurse had been called over to the Plaintiff's housing unit because he indicated that he could not get out of bed due to the back pain. He was transported to Health Services by wheelchair. Exam showed he was neurologically intact with good pulses sensation and circulation to the lower extremities. He was provided a Ketorolac and Prednisone injection. ECF No. 43-1 at 289-90.

On July 15, 2014, the Plaintiff saw Defendant Gherke for continued complaints of back pain. On exam of his lumbar spine, he had full range of motion, was nontender to palpation, had normal bony landmarks, normal lumbar lordosis, normal active range of motion, normal passive range of motion, and neurovascular was intact. It appears, that his Gabapentin was increased to 1500 mg twice-daily for 180 days, and he was also prescribed Amitriptyline 10mg daily for 180 days. ECF No. 43-1 at 286-87.

On July 17, 2014, the Plaintiff was seen by Dr. Ghodsi, for a neurosurgery consult. Dr. Ghodsi reviewed  the reports of  the MRI of the lumbar spine, cervical spine and brain from Stonewall Jackson Memorial Hospital done on December 5, 2012. However, the actual films were not available. The reports indicated that there was stenosis in the cervical and lumbar spine. Dr. Ghodsi discussed with the Plaintiff the need to get the actual MRI films for review to determine if any additional neurosurgery is needed on the neck or lumbar spine. Dr. Ghodsi indicated that his abnormal exam findings may be old from before the neck surgery in 2001. He recommended an EMG of the upper extremities to determine the cause of the Plaintiff's numbness and tingling. Dr. Ghodsi completed his report by indicating that he would see the Plaintiff back after they had the films and EMG. ECF No. 43-1 at 394-398.

On July 29, 2014, the Plaintiff refused the prescribed amitriptyline for pain, and it was discontinued. ECF No. 43-1 at 281. Id. at 279. However, on September 5, 2014, the Plaintiff reported that he was still in pain. Defendant Gherke prescribed Carbamazepine for nerve pain and renewed his prescriptions for acetaminophen, Gabapentin and ibuprofen.  Id. at 274-76. On September 22, 2014, the Plaintiff reported

medication side effects and nursing staff instructed him to discontinue the Carbamazepine. Id. at .

On October 22, 2014, Dr. Savidge evaluated the Plaintiff based upon multiple recent encounters and the neurology consultation from July. Dr. Savidge noted the Plaintiff's worsening condition, his intolerance to recent medication trials, and his concern over fall risk. Dr. Savidge further noted that the neurosurgeon had recommended an EMG before a follow-up visit. Abnormal gait and sensations were noted, Prednisone taper was prescribed, EMG and a neurosurgery follow up were noted to be approved, and a cane was to be issued the following day by an RN.  ECF No. 43-1 at 262-63.

On November 3, 2014, the Plaintiff reported not been able to get out of bed and did not report the pill line. The Plaintiff was evaluated in his housing unit by a nurse after medical was called to the unit. Upon the nurse's arrival, the Plaintiff was asleep in his bed. After the Plaintiff was awake, he reported unbearable pain from his right shoulder to his lower back and into his right foot. Examination indicated that the Plaintiff's right side appeared to be weaker than the left side. The nurse noted that the Plaintiff did not appear in any distress. ECF No. 43-1 at 255.  A mid-level provider later paged the Plaintiff to report to the medical department on two occasions, but he did not report. Id. at 253.  A note was entered by the mid-level provider the next day and indicated that the Plaintiff had spoken with her on November 3, 2014, during the afternoon prescription pick up and apologized for not reporting that morning when paged. The Plaintiff indicated that he was in a lot of pain and the mid-level provider indicated that is why she had called him over that morning. The mid-level provider also discussed with him the

pending EMG and follow-up and that she would discuss his concerns with his normal provider for a plan, but nothing else would likely be done until the follow up. Id. at 251.

On November 10, 2014, the Plaintiff reported to Health Services by wheelchair due to an inability to walk from contracture to his right leg and low back pain. The Plaintiff was examined by an RN and it was noted that he had good sensation, but with a weak pulse in the right foot. The Plaintiff had swelling to his right foot and ankle. ECF No. 43-1 at 249. Dr. Savage also examined the Plaintiff at that time. Dr. Savage made the determination to send the Plaintiff to the ER for further evaluation with possible urgent MRI due to underline cervical and lumbar spinal stenosis. Id. at 247. The MRI lumbar spine from that same date at the ER noted new changes at the L2-L3 of diffuse disc bulging with mild-to-moderate stenosis, new changes at the L3-L4 of diffuse disc bulging with disc extrusion and mild-to-moderate foraminal narrowing on the right, and L4-L5 of the diffuse disc bulge with the thecal sac effacement and mild-to-moderate stenosis of bilateral lateral recess. Id. at 795-96. The emergency room records noted diagnosis of acute lumbar myofascial strain, chronic low back pain, and degenerative joint disease lumbar spine causing stenosis. An injection of an anti-inflammatory and a muscle relaxer were the treatment. Id. at 374.

On December 25, 2014, the Plaintiff was examined in Health Services for his report of lower back pain that went down into his legs and into his hands. The Plaintiff stated that the pain started the night before after he was trying to do stretching and weightbearing exercises. The on-call mid-level provider approved a Ketorlac and prednisone injection, and a steroid burst pack for pain and inflammation. ECF No. 43-1 at 238-39.

On January 6, 2015, Defendant Gherke examined the Plaintiff for routine chronic care. The Plaintiff indicated that he was still going through the same pain. His prescriptions for ibuprofen and acetaminophen were renewed and the Gabapentin was increased. It was noted that it was still pending consultation for EMG and neurology.

On January 29, 2015, an examination was conducted by an outside neurologist. The report of this examination indicates that the Plaintiff did not seem to be in distress. He was noted to be well-developed and well nourished. There was no evidence of any speech or language deficits. Normal cranial nerves 2-10 and 12 were noted. Motor strength was 5/5 in the upper extremities and 4/5 in the lower extremities. He had increased tone, but the examining physician did not know for sure if it was resisting from the Plaintiff or if it was true spasticity. Reflexes were symmetrical. However, the Plaintiff's gait was unsteady. The examining physician noted: "this is a 50-year-old male with pain and numbness in both lower extremities. EMG nerve conduction study was negative. MRI of his lumbar spine does not explain the symptoms. We will obtain MRI of the cervical spine and brain. We will check his vitamin B12 level, vitamin D level, sed rate, ANA. If the above work up is negative, the patient will probably be recommended to have physical therapy and maybe Psychiatry to see if there is any underlying conflict or conversion disorder, secondary gain also is a possibility. I will see him for a follow-up in a month." ECF No. 43-1 at 805.

Dr. Savidge noted the consultation with a neurologist and substituted a muscle relaxer request for a formulary option and requested a follow-up appointment after labs and an MRI evaluation. According to Dr. Anderson's Declaration, the laboratory evaluation requested did not reveal any abnormality. ECF No. 43-1 at 8, ¶ 53. The

radiology report of the MRI indicates that examination through C2-C3 showed no significant central stenosis but did show minimal left foraminal narrowing. Examination through C3-C4 showed a small posterior disc osteophyte complex but no significant stenosis with mild left foraminal narrowing. Examination through C4-C5  showed facet arthrosis with unconvertebral joint degenerative changes and posterior disc osteophyte complex with leftward predominance. Examination through the  C5-C6 level revealed a posterior disc osteophyte complex resulting in a moderate to severe central stenosis with mild cord flattening. There were no findings of cord hemorrhage. However, the report noted that the degree of stenosis had increased as compared to 2013. Examination through the C6-C7 level revealed a posterior disc osteophyte complex with moderate central stenosis and mild cord flattening. Again, no cord hemorrhage was detected. However, there was severe left foraminal narrowing and moderate right foraminal narrowing which was unchanged. Examination of the C7-T1 level revealed a small left paracentral posterior disc osteophyte complex. No significant associated central stenosis was noted. However, there was mild right foraminal narrowing. The report noted that as compared to 2013, there was increasing posterior disc osteophyte complex at C5-C6 with a moderate to severe central stenosis with mild cord flattening and small focus of right cervical spinal cord myelomalacia or possibly edema distal to the stenosis. In addition, posterior disc osteophyte complex was noted at C6-C7 resulting in moderate central stenosis with mild cord flattening. The focus of myelomalacia distal to the stenosis was unchanged from 2013. Finally, the report indicated that the remainder of the examination showed similar spondylotic change in

facet arthrosis with varying degrees of central stenosis and foraminal narrowing as above unchanged. ECF No. 43-1 at 799.

On February 25, 2015, the Plaintiff had another neurology follow-up consultation. The specialist indicated that the Zanaflex was helping, and the Plaintiff had normal cranial nerves at 2, 3, 4, 5, 6, 7, 8, 9, 10 and 12. Motor strength was 4/5 throughout. The Plaintiff's gait was unsteady. The specialist indicated that he was planning to refer him to neurosurgery for possible surgery on his cervical spine because the MRI showed stenosis with flattening of the spinal cord. ECF No. 43-1 at 790. On February 27, 2015, Dr. Savidge requested the neurosurgery consultation. Id. at 635.

On March 12, 2015, Dr. Savidge deferred Zanaflex (Tizanidine) pending trial of increased Baclofen dose. The Baclofen was increased to 20 mg two times per day. ECF No. 43-1 at 634. On March 18, 2015, the Plaintiff was seen for follow up of pain medication dosage increase. He stated that the increase had done nothing to improve his pain or his muscle spasm/tension. The Plaintiff reported continued severe sharp pain in his legs especially with any touch or sudden movement. It appears that the plan was to renew the Plaintiff's prescription for Tizanidine. Id. at 631-32.

On March 27, 2015, the Plaintiff was seen in his living quarters by a nurse. He was in his bunk lying on his left side with his legs drawn up. He stated that he was supposed to get a change of medication the previous week but had had not received it. He stated that he was unable to move. He was  taken by wheelchair to medical for evaluation. The Plaintiff was given a steroid injection and an antihistamine injection. ECF No. 43-1 at 627-28. On or about April 1, 2015, the Plaintiff was placed back on Zanaflex. Id. at 625.

15

On April 16, 2015, Defendant Anderson examined the Plaintiff for his chronic care evaluation. Dr. Anderson counseled the Plaintiff at length regarding his degenerative disc disease and spinal stenosis. The Plaintiff was continuing to have spasms in both legs, had frequent pain and reported that none of his current or prior prescriptions seemed to help. The Plaintiff indicated that he wanted to get the surgery done and understood the likely rehabilitation recommendations and the difficulty of the same. On exam, the entirety of the Plaintiff's legs had notable atrophy, showed constant spasm and were tender to touch. The provisional diagnosis was cervical spinal stenosis with near paraplegic type status (atrophy, constant muscle spasms, loss of use, etc.). ECF No. 43-1 at 614-617. Defendant Anderson renewed the Plaintiff's pain and chronic care medications, requested physical therapy, requested a transfer board for assistance with daily living and recommended to the clinical director that there be a re-designation review. Id. The re-designation request was completed on April 21, 2015 and approved on April 22, 2015. ECF No. 43-1 at 9, ¶ 60. The Plaintiff was transferred to the Federal Medical Center in Lexington, Kentucky on May 5, 2015. ECF No. 43-1 at 788.

Medical notes from the Plaintiff's first day at FMC Lexington indicate that the Plaintiff was a "50 year old male with symptomatic stenosis, who is wheelchair dependent." It was noted that "[h]e requires evaluation by Neurosurgery, and [physical therapy/occupational therapy] to increase function." ECF No. 43-1 at 648. He was continued on Baclofen, Gabapentin and Ibuprofen for pain. Id. at 651.

The Plaintiff was seen at Rehabilitative Services on June 5, 2015, with chronic complaints of upper and lower back pain with radicular symptoms and progressive weakness in the bilateral extremities. The Plaintiff reported that he was worked up at

FCI Gilmer to see a local neurosurgeon who recommended surgical intervention. However, he was unsure what was wrong or what  the neurosurgeon told him concerning his condition. The Plaintiff was in a manual wheelchair and was able to manipulate his lower legs on the chair and could independently propel himself. He stated that he was unable to stand. The physical therapist was unable to test the Plaintiff's knee extension due to tightness in both knees. The Plaintiff stated that his goal was to get back to walking as soon as possible. The physical therapist indicated that the plan was to "[s]tart in clinic rehab focusing on improving range of motion and flexibility of his bilateral lower extremities. [The goal was full active range of motion] of bilateral knees in 6 weeks. Transfer sit to stand modified independent in 6 weeks. [Long term outcome]: Ambulate with cane 50 feet in 6 weeks." ECF No. 43-1 at 604. Thereafter, the Plaintiff was seen in physical therapy on July 31, 2015, August 10, 2015, August 13, 2015, August 14, 2015, August 17, 2015, August 19, 2015, August 20, 2015, August 21, 2015, August 24, 2015, August 25, 2015, August 26, 2015, August 27, 2015, August 28, 2015, September 1, 2015, September 2, 2015, September 3, 2015, September 4, 2015, September 9, 2015, September 11, 2015, September 15, 2015, September 16, 2016, September 17, 2015, September 18, 2015, September 21, 2015, September 22, 2015, September 24, 2015, September 28, 2015, October 1, 2015, October 5, 2015, October 8, 2015, October 14, 2015[8], October 15, 2015, October 20, 2015, October 21, 2015, October 27, 2015[9], November 4, 2015, and November 16,

---

[8] The administrative note on this date indicates that the Plaintiff walked the farthest distance in the parallel bars since coming to therapy, approximately 150 feet. ECF No. 43-1 at 495.

[9] The administrative note from this date indicates that the Plaintiff would be rescheduled for  the remainder of the week because he was not feeling well. He asked if he could get some rest, and the physical therapist agreed. The therapist noted that the Plaintiff was tired and would likely benefit  from some additional rest. ECF No. 43-1 at 477.

2015.The November 16th appointment was his final physical therapy visit prior to surgery. The notes from this date indicate that the when the Plaintiff was originally seen , it was thought they he had cervical myelopathy. He was seen at the University of Kentucky which confirmed results of MRI and CT that showed narrowing of spinal canal and was now simply awaiting his day to go out for his medical trip. The therapist noted that he did not feel that the Plaintiff would make any more gains that he had made previously through conservative treatment. The Plaintiff agreed to discontinue therapy at that time. ECF no. 43-1 at 466.

On July 7, 2015, a general administrative note was entered which indicated that an MRI of the cervical and lumbar spine would be ordered. The reason for the request was radicular manifestations with loss of strength and functional impairment.  In addition, it was noted that "[p]revious MRI apparently unable to be located and is necessary for further consultation and workup." ECF No. 43-1 at 596.

The Plaintiff was seen at the University of Kentucky Department of Orthopedic Surgery for a consultation on September 14, 2015. The reporting physician, Dr. Cassidy, noted that the Plaintiff had been using a wheelchair for about a year because of weakness in his legs. He was noted to have numbness and tingling in both hands. His chief complaint, however, was that his back hurt. He reported having difficulty dropping things and using his hands for fine motor control. Dr. Cassidy indicated that the Plaintiff had a posterior cervical decompression surgery in the late 90s. ECF No. 43-1 at 755. His cervical lumbar MRI from August 18, 2015 was reviewed. It showed severe multilevel stenosis causing myelomalacia. The stenosis was most severe at C5/C6/C7. However, there was moderate stenosis at C3/C4/C5. His cervical alignment

was slightly lordotic. His lumber MRI showed multilevel degenerative changes with a congenitally small canal causing mild moderate foraminal stenosis at multiple levels. None of the lumbar findings were considered terribly  significant. Dr. Cassidy provided the following assessment and plan:

> I think that with a gentleman who is having trouble walking with severe stenosis on MRI is clear evidence of myelopathy. I would recommend a laminoplasty C3 to 7 to address this. We discussed use of cadaver bone and the risk of disease transmission. He understands he is at some increase risk with a previous posterior procedure. I will need a CT scan to evaluate his bony anatomy prior to surgery. Versus risk of paralysis, death, infection dural tear. He understands without surgery he is at risk of minor trauma can cause paresis and that with myelopathy will likely progress. He does which to move ahead with surgery.

Id. at 756.

The Plaintiff underwent a CT of the cervical spine on October 27, 2015, which was performed at the University of Kentucky. The report of that scan noted an impression of multilevel spondylotic disease which was worst at the C6-C7 level. ECF No. 43-1 at 750-51.

The Plaintiff was eventually admitted to the  University of Kentucky Medical Center on December 11, 2015 for a C3-C6 laminoplasty  with reconstruction using allograft and a partial cranial C7 laminectomy. ECF No. 43-1 at 730. He tolerated the procedure well and was subsequently taken to the post-anesthesia care unit ("PACU") for stabilization and extubation. On December 14, 2015, it was felt that the Plaintiff had reached maximum benefit from hospitalization and was deemed ready for discharge. Id. at 736-37.

Following his discharge back the FMC Lexington, the Plaintiff was seen daily for dressing changes. Most of the staples were removed from the incision on December 21,

2015. ECF No. 43-1 at 442. The remainder of the staples were removed on December 24, 2015, and the collar was removed per the surgeon's plan. He was to be seen the following week in physical therapy. Id. at 440.

On December 28, 2015, the Plaintiff was seen by physical therapy. There was no drainage from the surgical site, the wound was clean, dry and well healed with no evidence of bleeding or open areas. There were no signs of infection, and he had finished his course of infection medication. The therapist was unable to access the protocol for the University of Kentucky surgeon regarding his post-surgical repair and indicated that he would attempt to bring the Plaintiff back that week once he had more details on the protocol. The Plaintiff indicated that he was noticing changes for the better since the surgery. He reported better movement of arms and legs. His grip strength was equal and strong, and he reported that some of the tingling and nerve related symptoms had "definitely decreased" when compared with pre-operative function. The therapist encouraged the Plaintiff to perform light active range of motion of the neck to avoid stiffness, but all range of motion was to be paid free and he was to avoid extremes of all motion until the therapist had further clarification on the protocol. ECF No. 43-1 at 438.

The final medical record is an administrative note from a physical therapist on December 30, 2015. At that time, the Plaintiff was three weeks post-op, and his surgeon had dictated that he was to start physical therapy after two weeks of stabilization in collar, which he already completed. The therapist suggested that the Plaintiff start very light on the exercises until he received more confirmation as to what was meant be "extension exercises" that were mentioned in the operative report.

## Contentions of the Parties

### A. Complaint

The Plaintiff provides a synopsis of his physical symptoms and medical care beginning in July of 2012, when he first complained about the pain in his back and his right upper arm. The Plaintiff alleges that he was provided inadequate treatment by the BOP medical staff, and as result, his entire life will now be struggle because "because member of the BOP Medical Staff told him his injury was in his mind." ECF No. 1 at 11. The Plaintiff further alleges that the inept level of care that he received at the hands of those charged with his health, safety and welfare has resulted in a life-long injury. In completing his complaint, the Plaintiff lists four claims for relief: (1) denial and delay of medical care in the most effective manner; (2) negligence; (3) malpractice; and (4) deliberate indifference to his serious medical needs. For relief, he requests a jury trial on punitive damages and is demanding $1,000,000 per defendant for exemplary and compensatory damages. He also requests retraining of all staff involved and an investigation of medical care in the BOP.

### B. Motion to Dismiss or, in the Alternative, for Summary Judgment

In their motion to dismiss or, in the alternative for summary judgment, the Defendants allege that the Plaintiff's complaint is untimely and barred by the applicable statute of limitation. In addition, the Defendants allege that even if his lawsuit is timely, the Plaintiff filed it without first properly and completely exhausting his administrative remedies. The Defendants also assert that the Plaintiff's negligence and malpractice claims are not cognizable in a Bivens action. The Defendants further contend that the Plaintiff has not adequately pleaded, nor can he establish, the particularized personal or supervisory involvement necessary to support a Bivens claims against any defendant.

Finally, the Defendants maintain that the Plaintiff has not adequately pleaded, nor can he establish, that any individual Defendant was deliberately indifferent to his medical needs.  C

### C. Plaintiff's Response

In his response to Defendants' motion, Plaintiff argues that his complaint has been filed within the applicable statute of limitations because he was not aware of his claims until an MRI in February of 2015  revealed stenosis, and he received "emergency" surgery in 2015.  He also argues that during the process leading up to his complaint, the Defendants "created an atmosphere, (machination) and intimidation that thwarts the efforts of less skillful inmates such as the Plaintiff." ECF No. 49. Accordingly, the Plaintiff argues that the administrative grievance process was unavailable to him. He further alleges that he has demonstrated that each Defendant is personally responsible for his injury. Finally, he maintains that he has satisfied the requirements of prevailing on an Eight Amendment claim of deliberate indifference.

### Legal Standard

### A. Motion to Dismiss

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir.1992) (citing 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1356 (1990)).  In considering a motion to dismiss for failure to state a claim, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff. Mylan Labs, Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir.1993); See Also Martin at 952.

The Federal Rules of Civil Procedure "require only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). Courts long have cited the "rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [a] claim which would entitle him to relief." Conley at 45-46. In Twombly, the United States Supreme Court noted that a complaint need not assert "detailed factual allegations," but must contain more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." Twombly at 554-55. Therefore, for a complaint to survive dismissal for failure to state a claim, the plaintiff must "allege facts sufficient to state all the elements of [his or] her claim." Bass v. E.I. DuPont de Nemours & Co., 324 F.3d 761, 765 (4th Cir.2003). In so doing, the complaint must meet a "plausibility" standard, instituted by the Supreme Court in Ashcroft v. Iqbal, where it held that a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009). Thus, a well-pleaded complaint must offer more than "a sheer possibility that a defendant has acted unlawfully" to meet the plausibility standard and survive dismissal for failure to state a claim. Id.

Plaintiff is proceeding *pro se* and therefore the Court is required to liberally construe his pleadings. Estelle v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S. 519, 520-1 (1972) (per curiam); Erikson v. Pardus, 551 U.S. 89, 94 (2007);

Loe v. Armistead, 582 F.2d 1291 (4th Cir. 1978); Gordon v. Leeke, 574 F.2d 1147 (4th Cir. 1978). While *pro se* pleadings are held to a less stringent standard than those drafted by attorneys, Haines, 404 U.S. at 520, even under this less stringent standard, a *pro se* complaint is still subject to dismissal. Id. at 520-21. The mandated liberal construction means only that if the Court can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so. Barnett v. Hargett, 174 F.3d 1128 (10th Cir. 1999). However, a court may not construct the plaintiff's legal arguments for her. Small v. Endicott, 998 F.2d 411 (7th Cir. 1993). Nor should a court "conjure up questions never squarely presented." Beaudett v. City of Hampton, 775 F.2d 1274 (4th Cir. 1985).

B. Motion for Summary Judgment

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In applying the standard for summary judgment, the Court must review all the evidence "in the light most favorable to the nonmoving party." Celotex Corp. V. Catrett, 477 U.S. 317, 322-23 (1986). The court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist. Anderson v. liberty lobby, Inc., 477 U.S. 242, 248 (1986).

In Celotex, the Supreme Court held that the moving party bears the initial burden of informing the Court of the basis for the motion and of establishing the nonexistence of genuine issues of fact. Celotex at 323. Once "the moving party has carried its burden

under Rule 56, the opponent must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Electric Industrial Co. V. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The nonmoving party must present specific facts showing the existence of a genuine issue for trial.  Id.  This means that the "party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial."  Anderson at 256.  The "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent the entry of summary judgment. Id. at 248.    To withstand such a motion, the nonmoving party must offer evidence from which a "fair-minded jury could return a verdict for the [party]."  Id.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987).  Such evidence must consist of facts which are material, meaning that they create fair doubt rather than encourage mere speculation.  Anderson at 248.  Summary judgment is proper only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party."  Matsushita at 587.

## Analysis

### A. Plaintiff's Motion for Discovery

The Plaintiff maintains that summary judgment should only be granted after adequate time for discovery. However, a party requesting discovery to oppose summary judgment must establish how specific discovery is essential to adequately oppose summary judgment. Harrods Ltd. v. Sixty Internet Domain Names, 302 F.3d 214, 244 (4th Cir. 2002) (quoting Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 961 (4th

Cir. 1996). Typically, this means that the party requesting discovery to oppose summary judgment must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed.R.Civ.P 56(d); Harrods, 302 F.3d at 244-45). The purpose of  the affidavit is to ensure that the party opposing summary judgment is "invoking the protections of [Rule 56(d)] in good faith and to afford the trial court the showing necessary to assess the merit of a party's opposition." First Chicago Int'l v. Untied Exchange Cp., 836 F.2d 1375, 1380 (D.C.Cir. 1988).

In short, a party opposing summary judgment cannot simply demand discovery for the sake of discovery. Hamilton v. Mayor & City Council of Baltimore, 807 F. Supp.2d 331, 342 (D. Md. 2011) (quoting Young v. UPS, No. DKC-08-2586, 2011 WL 665321, at *20 (D. Md. Feb. 14, 2011), aff'd, 707 F.3d 437 (4th  Cir. 2013), cert. granted, 134 S.Ct. 2898 (2014)).

In he instant case, has  not identified how any specific discovery is essential in order for him to oppose the Defendants' Motion for Summary Judgment. Therefore, the motion should be denied.

### B. Failure to Exhaust Administrative Remedies

Under the Prison Litigation Reform Act ("PLRA"), a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983, or any other federal law, must first exhaust all available administrative remedies. 42 U.S.C. § 1997(e)(a). Exhaustion as provided in 1997(e)(a) is mandatory. Booth v. Churner, 532 U.S. 731, 741 (2001). A Bivens action, like an action under 42 U.S.C. § 1983, is subject to the exhaustion of administrative remedies. Porter v. Nussle, 534 U.S. 516, 524 (2002). The exhaustion of administrative remedies "applies to all inmate suits about prison life, whether they

involve general circumstances or particular episodes," and is required even when the relief sought is not available. Booth at 741. Because exhaustion is a prerequisite to suit, all available administrative remedies must be exhausted prior to filing a complaint in federal court. See Porter , 534 US at 524 (citing Booth, 532 US at 741) (emphasis added).

In Woodford v.Ngo, 548 U.S. 81, 84-85. (2006), the United States Supreme Court found that the PLRA's exhaustion requirement serves three main purposes: (1) to "eliminate unwarranted federal court interference with the administration of prisons;" (2) to "afford corrections officials time and opportunity address complaints internally before allowing the initiation of a federal case;" and (3) to "reduce the quantity and improve the quality of prisoner suits."  Therefore, the PLRA exhaustion requires full and proper exhaustion.  Woodford, at 92-94. Full and proper exhaustion includes meeting all the time and procedural requirements of the prison grievance system. Id. at 101-02.

The Federal Bureau of Prisons ("BOP") has established a three-tiered Administrative Remedy Procedure, set forth in Title 28 of the Code of Federal Regulations, for the formal review of complaints filed by inmates relating to the conditions of their confinement. 28 C.F.R. § 542.10, et seq. Under this system, an inmate must first request an informal resolution by presenting an issue of concern informally to a staff member. 28 C.F.R. § 542.13(a). If the informal resolution fails, or if an inmate is dissatisfied with the informal response, or if there is no response, the inmate may then submit a Request for Administrative Remedy, in the form of a formal written complaint, on  the proper form (BP-9), to the Warden of the institution within 20 20 calendar days of the date of the occurrence on which the complaint is based. See 28

C.F.R. § 542.14(a). If the inmate's request is denied; if the inmate is not satisfied with

the institutional Warden's response; or there is no response from the Warden within 20

days, the inmate may file an appeal with the appropriate Regional Office for the

geographic region in which the inmate's institution is located, using the appropriate form

(BP-10), within 20 calendar days of the Warden's response or the date the response

would have been due.  See 28 C.F.R. § 542.15(a). If the Regional Office denies relief,

the inmate completes the administrative remedy process by appealing the decision to

the Office of General Counsel, or the "Central Office," in Washington, DC, using the

appropriate form (BP-11), within 30 days of the date the Regional Director signed the

response.[10] Id. The General Counsel's written response to the inmate's appeal is the

final decision of the administrative remedy process, and inmate is not deemed to have

fully exhausted his or her administrative remedies until the request has been filed and

acted upon at all the required agency levels. An inmate is not deemed to have

exhausted his administrative remedies until he has filed his complaint at all levels.  28

C.F.R. § 542.10-542.15; Gibbs v. Bureau of Prison Office, FCI, 986 F.Supp. 941, 943

(D.Md. 1997).

　　　　Within the BOP  record-keeping system, each administrative remedy request is

assigned a six-digit numerical ID, or case number, as well as an alpha-numeric suffix.

---

[10] "If accepted, a Request or Appeal is considered filed on the date it is logged into the
Administrative Remedy Index as received.  Once filed, response shall be made by the Warden
or CMM within 20 calendar days; by the Regional Director within 30 calendar days; and by the
General Counsel within 40 calendar days...If the time period for response to a Request or
Appeal is insufficient to make an appropriate decision, the time for response may be extended
once by 20 days at the institutional level, 30 days at the regional level, or 20 days at the Central
Office level. Staff shall inform the inmate of this extension in writing. Staff shall respond in
writing to all filed Requests or Appeals.  If the inmate does not receive a response within the
time allotted for reply, including extension, the inmate may consider the absence of a response
to be a denial at that level." 28 C.F.R. § 542.18.

For each specific remedy request, the numerical ID, or case number, remains the same, while the alpha-numeric suffix may change, depending upon the progression of the request through the various levels of administrative review. The alpha portion of the suffix indicates the specific level of the administrative review process.  Thus, the suffix "F" identifies a remedy request at the institutional (the facility) level, while the letter "R" represents the Regional Office level, and the letter "A" indicates the General Counsel, or the Central Office level. The numeric portion of the suffix indicates the number of times that particular administrative grievance has been filed at a specific level. For example, "F1,"  indicates the inmate has filed once at the institutional level. If the inmate is rejected at that level and re-files at the same level, the suffix would be "F2."

As previously noted, the Plaintiff arrived at FCI Gilmer on August 28, 2009, and remained at that facility until May 5, 2015, when he was transferred to FMC Lexington. Each of the defendants named in the Plaintiff's complaint, including the three who were dismissed for lack of service, were employed at FCI Gilmer.

In his sworn complaint, the Plaintiff stated that he had filed a grievance concerning the facts relating to his complaint and identified grievance #827820 as the administrative grievance procedure in which the claims raised in his complaint were addressed. However, the BP-9 for the grievance was not signed by the Plaintiff until July 5, 2015, after he arrived at FMC Lexington. The Plaintiff thereafter filed a BP-10 and BP-11, thus exhausting the grievance procedure, However, to the extent the Plaintiff was attempting to grieve issues related to his medical care at FCI Gilmer, the grievance was prepared and filed more than two months after he arrived at FMC Lexington, and therefore, more than 20 days after the last possible action by staff at FCI

Gilmer. Therefore, it is untimely as to all the defendants and does not exhaust properly the claims raised in his complaint.

The undersigned recognizes that several courts have found that the mandatory exhaustion requirement may be excused in certain limited circumstances.  See Mitchell v. Horn, 318 F.3d 523, 529 (3d Cir. 2003) (summary dismissal for failure to exhaust not appropriate where prisoner was denied forms necessary to complete administrative exhaustion); Ziemba v. Wezner, 366 F.3d 161 (2d Cir. 2004) (defendant may be estopped from asserting exhaustion as a defense where the defendant's actions render the grievance procedure unavailable); Aceves v. Swanson, 75 Fed.Appx. 295, 296 (5th Cir. 2003) (remedies are effectively unavailable where prison officials refuse to give inmate grievance forms upon request); Miller v. Norris, 247 F.3d 736, 740 (8th Cir. 2001) (a remedy is not available within the meaning of § 1997e(a) when prison officials prevent a prisoner from utilizing such remedy); Dotson v. Allen, 2006 WL 2945967 (S.D.Ga. Oct. 13, 2006) (dismissal for failure to exhaust not appropriate where the plaintiff argues that failure to exhaust was direct result of prison official's failure to provide him with the necessary appeal forms).

In his response to the Defendants' Motion to Dismiss or for Summary Judgment, the Plaintiff alleges that he made many attempts to navigate the administrative remedy procedure and attached two exhibits which he maintains establish those efforts. The exhibits supplied by the Plaintiff and Defendants establish that the Plaintiff filed a BP-9 on July 5, 2011, requesting to have an MRI and X-Ray. It was assigned Remedy ID 646328-F1. ECF No. 43-1 at 829. The Plaintiff appealed to the Regional Office on November 17, 2011, where it was rejected because it was late. The Plaintiff was

informed that he must have a staff memo to verify that it was late through no fault of his own. Id. at 830. The Plaintiff did not refile with a staff memo, nor did he file a BP-11. In addition, on September 13, 2013, the Plaintiff filed a BP-9 involving a medical complaint and allegations of retaliation. It was assigned Remedy ID 749621-F1 and was rejected on that same date. Id. at 831. The Plaintiff refiled that remedy on September 24, 2013, and it was closed that same date. Id. The Plaintiff did not appeal to the Regional Office. On September 24, 2013, the Plaintiff filed a BP-9 complaining that the right side of his body was numb/tingling and his left side was dragging. It was assigned Remedy ID 751015-F1. It was closed that same date, and the Plaintiff did not appeal to the Regional Level. On October 9, 2013, the Plaintiff file a BP-9 requesting a cane. This grievance was assigned Remedy ID 752981-F1 and was closed on October 9, 2013. Id. The Plaintiff did not appeal to the Regional Office.

The undersigned has construed the Plaintiff's response as an allegation that exhaustion  of the grievance procedure should be excused in this case. He relies on the decision in Ross v. Blake, 136 S.Ct. 1850 (2016). As the United States Supreme Court explained in Ross, "an inmate is required to exhaust  those, but only those, grievance procedures that are 'capable of use 'to obtain 'some relief for the action complained of.'" Id. at 1859 (citing Booth v. Churner, 532 U.S. 731, 738 (2011).The Ross court outlined three limited circumstances in which administrative remedies are deemed unavailable under the PLRA: (1) When the administrative procedure "operates as a simple dead and -- with officers unable or unwilling to provide any relief to aggrieved inmates," (2) When the administrative scheme is so opaque that it is "essentially unknowable" and "no ordinary prisoner can discern or navigate it," and (3) "[W]hen prison administrators

thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 1858-61.  The Plaintiff has offered no plausible claim that administrative remedies were not available to him. Therefore, the undersigned finds that the Plaintiff has failed to demonstrate a genuine issue of fact regarding the availability of the grievance procedure to him at FCI Gilmer, and this case is due to be dismiss for failure to exhaust the administrative grievance process. Moreover, even if the Court were to find that the Plaintiff's one exhausted grievance properly addressed the claims at issue, or if the Court were to deem the grievance process unavailable, as explained below the Plaintiff's complaint is still subject to dismissal.

### C.  **Statute of Limitations**

For purposes of determining the appropriate statute of limitations, claims filed pursuant to 42 U.S.C. § 1983 are analogous to "general personal injury actions." Wilson v. Garcia, 471 U.S. 261, 279 (1985). Thus, their timeliness is determined based upon the relevant state limitations period for personal injury actions. Because Bivens is the federal equivalent to an action under § 1983, federal courts have consistently extended the state general personal injury statute of limitations in Bivens cases, as well as § 1983 claims. See, e.g. Chin v. Bowen, 833 F.2d 21, 23-24 (2d Cir. 1987). In fact, the Fourth Circuit Court of Appeals has determined that West Virginia's two year personal injury statute of` limitations contained at W.Va. Code § 55-2-12(b) is appropriately applied in Bivens actions. See Reinhold v. Evers, 187 F.3d 348, 359, n. 10 (4th Cir. 1999).

W,Va, Code § 55-2-12(b) provides:

> Every personal action for which no limitations is otherwise
> prescribed shall be brought: (a)  within two years next after

the right to bring the same shall have accrued if it be for damage to property; (b) within two years next after the right to bring the same shall accrued if it be for damages for personal injuries; and (c) within one year or next after the right to bring the same shall have accrued if it be for any other matter of such a nature that, in case a party dies, it could not have been brought at common law by or against his personal representative.

Under federal law a cause of action accrues when the plaintiff "possesses sufficient facts about the harm done to him that reasonable inquiry will reveal his cause of action." Nassim v. Warden, Maryland House of Correction, 64 F.3d 951, 955 (4th Cir. 1995) (citations omitted). Therefore, a cause of action accrues either when the plaintiff has knowledge of his claim or when he is put on notice—e.g., by the knowledge of the fact or injury and who caused it—to make reasonable inquiry and that inquiry would reveal the existence of a colorable claim. Id.

The Plaintiff's complaint revolves around his medical care at FCI Gilmer. More specifically, his care of lack thereof for spinal stenosis. The Plaintiff specifically alleges that medical staff at FCI Gilmer failed to diagnose him with spinal stenosis when he "complained about the pain in his back and under his right arm" in July of 2012. ECF No. 1 at 8, 14. In his Remedy ID 151015-F, dated September 12, 2013, the Plaintiff indicated that he had filed several copouts concerning his health. Specifically, he mentioned no feeling on the right side of his body, numbness and tingling on that same side, and his left leg was dragging. He also noted that he met with Dr. Anderson on June 27, 2013 and was told that when he got his head scanned, he would be able to tell him what the problem was. ECF No. 49-2 at 2.

Therefore, pursuant to the standard set forth in Nassim, there can be little doubt that the Plaintiff knew that he had a serious medical condition by July of 2013 and

possessed enough knowledge of his cause of action to place him on inquiry notice. Because the Plaintiff did not file his complaint until October 30, 2016, more than three years later, his complaint is subject to dismissal under the statute of limitations.

The undersigned is cognizant that while a plaintiff pursues his administrative remedies, as he is obligated to do by the PLRA, the otherwise applicable statute of limitations is tolled. However, none of the remedies filed at FCI Gilmer were ever exhausted, and the grievance he filed at FMC Lexington could not exhaust the issues raised in this complaint because it was not filed within 20 days after the last possible date that medical staff at FCI Gilmer had any contact with him. Therefore, there is no grievance which tolled the limitations period, and this complaint is due to be dismissed as untimely. Moreover, even if it deemed timely, it is due to be dismissed as more fully discussed below.

### D. <u>M. Weaver</u>

An action under Bivens is like an action under 42 U.S.C, § 1983, except the former is maintained against federal officials for constitutional violations, while the latter is against state official for violations of constitutional or other federally protected rights. See <u>Carlson v. Green</u>, 446 U.S. 14, 18-19 (1980) (applying <u>Bivens</u> in prison context); <u>Butz v. Economous</u>, 438 U.S. 478, 504 (1978). Under <u>Bivens</u> or § 1983, the plaintiff must show that the defendant's personal conduct violated his rights. <u>Trulock v. Freeh</u>, 275 F.3d 391, 402 (4th Cir. 2001) (<u>Bivens</u>); <u>Vinnedge v. Gibbs</u>, 550 F.3d 926, 928 (4th Cir. 1977) (finding that1983 "liability will only lie where it is affirmatively shown that the official charged acted personally in the deprivation of the plaintiff's rights" because "[t]he doctrine of respondeat superior has no application under this section.") (internal

quotation marks and citations omitted).  Therefore, to establish liability under <u>Bivens</u>, a plaintiff must specify the acts taken by each defendant which violate his constitutional rights.  <u>See</u> <u>Wright v. Smith</u>, 21 F.3d 496, 501 (2d Cir. 1994); <u>Colburn v. Upper Darby Twp</u>., 838 F.2d 663, 666 (3d Cir. 1988).  Some sort of personal involvement on the part of the defendant and a causal connection to the harm alleged must be shown.  <u>See</u> <u>Zatler v. Wainright</u>, 802 F.2d 397, 401 (11th Cir. 1986).

Here, Plaintiff identified Defendant Weaver as the FCI Gilmore Health Services Administrator.  ECF No. 1 at 2. In his complaint, Plaintiff never alleges that Defendant Weaver was personally involved in evaluating or treating his medical needs or conditions. In addition, Plaintiff never alleges that Defendant Weaver was personally involved in any decisions that he alleges delayed or diminished the medical care provided him. In fact, other than naming him as a party to this action, Plaintiff never again mentions Defendant Weaver. Therefore, the complaint fails to present the personal involvement necessary to maintain a <u>Bivens</u> action against Defendant Weaver.

### E.  <u>Deliberate Indifference</u>

The Eighth Amendment protects prisoners from punishments which "'involve the unnecessary and wanton infliction of pain or are grossly disproportionate to the severity of the crime." <u>Rhodes v. Chapman</u>, 452 U.S. 337, 346 (1981). These principles apply to the conditions of confinement and require that the conditions within a prison comport with "contemporary standard[s] of decency" to provide inmates with "the minimal civilized measure of life's necessities."  <u>Id</u>. at 347; <u>See</u> <u>also</u> <u>Farmer v. Brennan</u>, 511 U.S. 825, 832 (1994) (explaining that both the treatment of prisoners and the conditions of their confinement are subject to scrutiny under the Eighth Amendment).

To establish a violation of the Eighth Amendment with respect to medical care, an inmate must prove two elements. See Johnson v. Quinones, 145 F.3d 164, 167 (4th Cir. 1998). First, the inmate must objectively prove that the deprivation of medical care was "sufficiently serious." Id. Second, the inmate must subjectively prove that prison staff acted with a "sufficiently culpable state of mind." Id.

The objective element is satisfied by proof of the inmate having a serious medical need. Id. A medical condition is sufficiently serious if it is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" Jackson v. Lightsey, 775 F.3d 170, 178 (4th Cir. 2014); see also Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203, 208 (1st Cir. 1990), cert. denied, 500 U.S. 956 (1991). A medical condition is also serious if a delay in treatment causes a life-long handicap or permanent loss. Monmouth County Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3rd Cir. 1987), cert. denied, 486 U.S. 1006 (1988).[11]

---

[11] The following are examples of what does or does not constitute a serious injury. A rotator cuff injury is not a serious medical condition. Webb v. Prison Health Services, 1997 WL 298403 (D. Kansas 1997). A foot condition involving a fracture fragment, bone cyst and degenerative arthritis is not sufficiently serious. Veloz v. New York, 35 F.Supp.2d 305, 312 (S.D.N.Y. 1999). Conversely, a broken jaw is a serious medical condition. Brice v. Virginia Beach Correctional Center, 58 F. 3d 101 (4th Cir. 1995); a detached retina is a serious medical condition. Browning v. Snead, 886 F. Supp. 547 (S.D. W.Va. 1995). And, arthritis is a serious medical condition because the condition causes chronic pain and affects the prisoner's daily activities. Finley v. Trent, 0955 F. Supp. 642 (N.D. W.Va. 1997). A pituitary tumor is a serious medical condition. Johnson v. Quinones, 145 F.3d 164 (4th Cir. 1998). A plate attached to the ankle, causing excruciating pain and difficulty walking and requiring surgery to correct it is a serious medical condition. Clinkscales v. Pamlico Correctional Facility Med. Dep't., 2000 U.S. App. LEXIS 29565 (4th Cir. 2000). A tooth cavity can be a serious medical condition, not because cavities are always painful or otherwise dangerous, but because a cavity that is not treated will probably become so. Harrison v. Barkley, 219 U.S. 132, 137 (2nd Cir. 2000). A prisoner's unresolved dental condition, which caused him great pain, difficulty in eating, and deterioration of the health

The subjective element is satisfied by showing deliberate indifference by prison staff.  Johnson, 145 F.3d at 167.  The Fourth Circuit has summarized what constitutes deliberate indifference:

> To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate or excessive as to shock the conscience or to be intolerable to fundamental fairness. Deliberate indifference may be demonstrated by either actual intent or reckless disregard. A defendant acts recklessly by disregarding a substantial risk of danger that is either known to the defendant or which would be apparent to a reasonable person in the defendant's position. Nevertheless, mere negligence or malpractice does not violate the eighth amendment.

Miltier v. Beorn, 896 F.2d 848, 851-52 (4th Cir. 1990) (citations omitted). Furthermore, so long as the medical treatment given is adequate, the fact that an inmate would have preferred a different type of care does not constitute deliberate indifference. Chance v. Armstrong, 143 F.3d 698, 703 (2nd Cir. 1998).  Similarly, the fact that other medical professionals would have pursued a different type of treatment does not, by itself, establish deliberate indifference. Hanson v. Smith, 9 F.3d 1557 (10th Cir. 1993). Accordingly, deliberate indifference is "generally not found when some significant level of medical care has been offered to the inmate."  Atwater v. Gabriel, 2012 WL 750754 (M.D.Pa. 2012).

---

of his other teeth, was held to be sufficiently serious to meet the Estelle standard. Chance v. Armstrong, 143 F.3d 698, 702 - 703 (2nd Cir. 1998).  A degenerative hip condition that caused a prisoner "great pain over an extended period of time and . . . difficulty walking" is a serious condition. Hathaway v. Coughlin, 37 F.3d 63, 67 (2nd Cir. 1994). Under the proper circumstances, a ventral hernia might be recognized as serious. Webb v. Hamidullah, 281 Fed. Appx. 159 (4th Cir. 2008). A twenty-two hour delay in providing treatment for inmate's broken arm was a serious medical need. Loe v. Armistead, 582 F.2d 1291, 1296 (4th Cir. 1978). A ten-month delay in providing prescribed medical shoes to treat severe and degenerative foot pain causing difficulty walking is a serious medical need. Giambalvo v. Sommer, 2012 WL 4471532 at *5 (S.D.N.Y. Sep. 19, 2012

Even accepting that the Plaintiff suffered from a serious medical condition, thus satisfying the objective element, the medical records as detailed above establish that he has received substantial and adequate care. Those records clearly establish that the Plaintiff was seen on multiple occasions, was monitored for progress, was prescribed medication to control his pain, was provided diagnostic testing including x-rays, MRIs CT scans, an EMG, and was referred for consults as needed.  In addition, on at least one occasion, the Plaintiff was sent to the Emergency Room for further evaluation. It is also pertinent to note that on January 29, 2015, a neurologist examined the Plaintiff and determined that the EMG nerve conduction study was negative, and the MRI of his lumbar study did not explain the symptoms. Therefore, he indicated that an MRI of the brain and cervical spine would be obtained, and the Plaintiff probably would be recommended for physical therapy and maybe psychiatry. ECF No. 43-1 at 805. The Plaintiff's transfer to F MC Lexington was initiated on April 21, 2015, when Defendant Anderson made a recommendation to the clinical director for a re-designation review. The Plaintiff was transferred on May 5, 2015, as the result of the need for increasing medical care.  Even after his transfer, the Plaintiff was treated conservatively, and did not undergo surgery until December 11, 2015, seven months after his transfer.[12]

In short, the medical records fail to establish that Plaintiff's treatment by Medical Services at FCI Gilmore was improper, let alone so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.

---

[12] The Plaintiff alleges that the surgery was unnecessarily delayed because FCI Gilmer did not send his MRI performed while he was at FCI Gilmer to FMC Lexington. However, within  one month of a general administrative note that an MRI of the cervical and lumbar spine would be ordered because the previous MRI was unable to be located, the Plaintiff had a cervical/lumbar MRI performed on August 18, 2015 and was reviewed by the University of Kentucky Department of Orthopedic surgery on September 14, 2015.

Furthermore, to the extent that the Plaintiff alleges that his medical care at FCI Gilmer amounted to malpractice,  ordinary medical malpractice based upon negligence in providing care does not state a claim under the Eighth Amendment.  See Estelle, 429 U.S. at 106. ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). Finally, most cases alleging medical Eighth Amendment violations concern the denial of medical care to a prisoner rather than the provision of substandard care; "no care," rather than "bad care."  See e.g., Holmes v. Sheahan, 930 F.2d 1196 (7th Cir.), cert. denied, 502 U.S. 960 (1991).  Here, even if the plaintiff received "bad care," which the undersigned does to believe he did, he did receive care.   Accordingly, nothing in the record or in the Plaintiff's complaint establishes enough facts to support a finding that the Defendants have been deliberately indifferent to his medical needs, and accordingly, the Plaintiff's complaint as it relates to his Eighth Amendment claim under Bivens should be dismissed for failure to state a claim.

## **RECOMMENDATION**

For the reasons stated above, it is hereby **RECOMMENDED** that Defendants' Motion to Dismiss or, in the alternative, Motion for Summary Judgment [ECF No. 42] be **GRANTED**, the Plaintiff's Motion for Discovery [ECF No. 49] be **DENIED** and the Plaintiff's Complaint be **DISMISSED**.

The Petitioner shall have fourteen days from the date of filing this Report and Recommendation within which to file with the Clerk of this Court, **specific written objections, identifying the portions of the Report and Recommendation to which objection is made, and the basis of such objection.**  A copy of such objections

should also be submitted to the United States District  Judge. Objections shall not exceed ten (10) typewritten pages or twenty (20) handwritten pages, including exhibits, unless accompanied by a motion for leave  to exceed the page  limitations, consistent with LR PL P 12.

**Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.** *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

The Clerk is **DIRECTED** to send a copy of this Report and Recommendation to the *pro se* Plaintiff by certified mail, return receipt requested, to his last known address as shown on the docket, and to counsel of record by electronic means. In addition, because this Report and Recommendation completes the referral from the District Court, the Clerk is **DIRECTED** to terminate the Magistrate Judge association with this case.

ENTERED: March 12, 2019

*/s, James P. Mazzone*
JAMES P. MAZZONE
UNITED STATES MAGISTRATE JUDGE